Good afternoon and may it please the court, Noah Schubert on behalf of appellants in the class, I'd like to reserve three minutes for rebuttal. The district court erred when it granted ARRIS summary judgment. Let me quickly highlight two of those errors. First, Plaintiff Brian Alexander bought his modem as an upgrade over his old ARRIS modem. That was because ARRIS advertised that it was superior to its two older models for four specific functions. But in reality, Alexander testified that his new modem was inferior for those functions. That was confirmed by ARRIS' own testing, abnormally high return rates, and a consumer survey that showed that purchasers would have paid over 53% less. But despite this evidence, the district court itself decided that no reasonable consumer could rely on ARRIS' comparison charge. Second, the district court erred when it held that ARRIS had no duty to disclose the modem's defects because they merely drastically undermined its central function rather than making it unusable. But that is not what this court held in Hodgston, which makes clear that under California law, a material defect need only affect a product's central function to create a duty to disclose. And I think if the court looks at its decision in Hodgston, there in discussing the central defect test, it used the word affect or relate to seven times in discussing that test, and in fact, the very second paragraph of the Hodgston decision makes clear that they hold, and this is a quote, that they are not actionable because they are quote, not physical defects that affect the central function of the chocolate products. Well, here these are physical defects. It's a defect in the PUMA 6 chip that's in every ARRIS modem, and they clearly affected the central function as there was substantial evidence. Before you go further, what's your strongest case to support your argument that use of the phrase superior to is an actionable statement? I think our strongest case from this court would be the Sterling drug case. I think that case is really on point because there it's talking about the superiority of individual attributes. In Sterling, the FTC challenged Bayer's ads that it quote, tested its aspirin against every other leading brand for purity, stability, speed of disintegration. Bayer was consistently better. And the court... Isn't that a little bit more specific than we have here? As you noted, those were tested for specific attributes. I don't think so, Your Honor. There are the attributes for purity, stability, speed of disintegration. Here are the attributes, and this is, we put the box in on page 13 of our reply brief, are HD multimedia streaming, internet browsing, large file downloads, music videos, and high performance online gaming. So I think the attributes is very similar. And the... Where is the representation that these modems were tested against each other? Yes, and I think our expert's conclusions were based on ARRIS and Intel's own internal testing. And I think the other point I would make in why I think... Counselor, before we leave that point, doesn't there have to be a representation that it was tested? Not independent testing, but as you noted in the sterling drug case, there was a representation from the product provider that they had tested it, and these were the results. Do we have that here? There's not a statement on the box that it was tested, but I think under California law, you would look to whether this could mislead a reasonable consumer, whether the advertising is the type of advertising that could be misleading. And I think it does matter here, and I think our case is stronger than sterling in the respect that here they're talking about their own products, not a competitor's products. They developed this as an upgrade over their older models, and I think... And did their own testing. And so I think if a reasonable consumer is out shopping at Best Buy, and they're looking at the boxes and trying to figure out which mode to buy, and they look at this chart, and they say, well, the 6190 is five stars for HD multimedia streaming, I think a reasonable consumer would say, well, that means it's better, and I'm gonna pay more for that product. So I think this is a stronger case than sterling. The problem you have is that many of the cases have deemed those types of statements as puffery, as opposed to substantive statements of fact. Yeah, and I think some of the cases that Eris cites in its brief are much more general statements that we would traditionally think of as puffery. So if you're looking at this page on page 13 of our reply brief, below the chart, you have statements like blazing fast internet, ultimate gaming, instant gratification. I think those are the types of statements that would really be exaggerated statements that are not objectively true. But I think when you're taking a look at individual attributes, these categories in the chart, and comparing them to Eris's own prior models, I think that is specific. And California law really looks to the specificity or generality of the claim. That's the Dimitri's case, Dimitri's Yelp in the California Court of Appeal, where they found that some statements, which I think are much more general than the statements we have here, were actionable. Did you have a question, Judge Rawlinson? I'm listening. Okay. So I think on the question of the representations, those were very specific, and we have evidence in the case that they did their own testing, and we have testing on each of those latency attributes. And I would also add that this is not a case where it's summary judgment. This is de novo review. It's not a case where Eris objected to any of the evidentiary submissions. They didn't make a Daubert motion at summary judgment. In fact, they submitted our experts' own reports in an attempt to win summary judgment. So they waived it. Well, that doesn't mean that the expert's opinion should be automatically credited just because they didn't challenge him as an expert. I think at summary judgment, the court needs to look at whether there was sufficient evidence to create a triable issue of fact. And I think here we're looking at this question of materiality, and the cases hold, both in this court and in California, that materiality is almost always a question of fact. We have our experts' conclusions that these problems significantly impacted the core functions in terms of slow web browsing, glitches with audio and video streaming, dropouts during Zoom, frequent reboots of the modem. And I think this court held in Williams that whether a business practice is deceptive will usually be a question of fact. The California Supreme Court has held that materiality is a question of fact unless the fact represented is so obviously unimportant that the jury could not reasonably find that a reasonable person would have been influenced by it. That's the Tobacco 2 decision. So I think that's a very low bar under California law. And with the evidence we put in, I think a reasonable jury could easily find that this was not obviously unimportant. We have the evidence that there were 31% returns at the modems that shows materiality. We have the evidence that consumers overpaid by over 53% for the modems based on the results of a conjoint study that measured consumers' reactions to these representations and the damages that were associated with them. So I think there was a lot of significant evidence. And, you know, the district court, in a number of instances, looks at the move-ins evidence. They look at Eris' evidence and their experts' and credits their conclusions to kind of minimize these defects. And I think that type of weighing of the evidence at summary judgment was kind of obviously improper at the summary judgment stage. This is an issue that really should have gone to trial. Counsel, what effect, if any, did the qualifiers have? The qualifiers that were I think the fine print that's on the bottom of the box does not disclose that the modem is worse in these four categories. It's just kind of boilerplate legal language. And, you know, even if it had disclosed in the fine print, I think this court's decision in Williams makes it very clear that a reasonable consumer is not expected to go look at the fine print on the bottom or the side of the box. And in large lettering, it has advertising that is misleading or has the tendency to mislead. So, you know, I don't think Eris can absolve itself of liability simply because of the kind of boilerplate legal language that it put on the bottom of the box. Counsel, what exactly were the defects, the performance issues, that were experienced by the consumers? Sure. So, you know, our expert took a look at network latency, and this is the delay in sending or receiving data. And he found there were a series of defects in particular internet protocols, TCP, UDP. And he did kind of an exhaustive analysis to see, well, with those specific differences and those defects, what would the effects would be? And he found that the HTTP, TCP, and DNS defects caused significantly slower web browsing, significantly slower file transfers. That's at SDR 4340 through 41. He also found that the UDP defects caused significantly worse experience playing online games. That's at SDR... Counsel, could we explore that a little? Did the expert identify any minimum standards with respect to those defects that he identified? What was the minimum standard at which he measured the defects? Sure. In terms of industry standards, I think, you know, Dr. Newman testified that the benchmarks, and these were ERISA's and Intel's own internal benchmarks, quote, intended to provide a standardized means by which products can be compared and a degree of expected performance. That's at SDR 4297. And I think there is... The problem with that is that he said there is no minimum standard. So how can it be that they fail to meet the minimum standard if there is no minimum standard articulated for those particular defects? I think there was an industry standard that he relied on based on ERISA and Intel's own testing, where they relied on something called the Zafico benchmarks to provide a series of tests under ordinary circumstances where you would test these types of latency issues. And, you know, I think those types of benchmarks are a measure of industry standards, and the modem was deficient on them. If there are no further questions, I see I'm running into my rebuttal time. Why don't you save that? We'll end. We'll hear from the other side and come back to you later. Thank you, Your Honor. Good afternoon. Nancy Stagg on behalf of the Appellee ERISA International. Of course, our position is that the court should affirm the district court's judgment granting summary judgment. But I want to answer Judge Rawlinson's questions. Going back to the Sterling case, I'm happy to answer other questions, but I want to pick up right where Mr. Schubert left off and talk about Sterling drug and why that is not a case that this court should apply with regard to finding that these statements were not puffery. They were puffery. The Sterling drug case is a Ninth Circuit case from 1984. In that case, as Judge Rawlinson noted, the representations were actually much more along the lines of lack of substantiation for claims made. And what happened in that case is there in the 1980s is relying on a 1971 in-house study where it compared 200 brands of aspirin on very specific attributes including purity, stability, and speed of disintegration. So there was a lot of work that had been done in comparison to all of these other products. So that is very much different from what we have here where the representations are, as the district court found, mere puffery because it is just showing a four-star award, if you agree, and five stars to the SB 6190. And also, Mr. Schubert keeps talking about the actual representation of performance and really, as the testimony was by Ms. Hayes in the record, and we've cited it in the brief, it was really meant to be a better, you know, best, here are two, compare it to actually three models, you know, a better and best scenario. The stars only relate to actual activities that a consumer might be doing and really doesn't talk about a specific type of performance. Can I interrupt for just a minute? In what respect is the 69 or was the 6190 actually better? We've been hearing a lot about how it's worse, but in what respect? In the 3075, which is the back of the product box, it's very clearly denoted there, it has a download speed of up to 1.4 gigabits per second, it has 32 channel download by 8 up. If you compare that to the 6183, the 6183 was, you know, materially fewer channels from both download and upload, and so the maximum speed, the maximum speed on the 6183 was only 686, where you could get up to 1.4 gigs on the 6190. So, you know, we did make that argument below, the court didn't rule on that issue, found it to be puffery, but alternatively, this court, on its de novo review, and affirming on any ground in the record, could say, you know, that's a plaintiff's own expert agreed when he reviewed the Intel and the AERIS test results, that in the instance of throughput, the 6190 was 25% better or faster. So there was plenty of evidence in the record for the court to find that that those actual five-star rating compared to the 6183, which is the claim that appellants have brought here, was true. So it was puffery. The evidence in the record also supports that those statements were true. It seems to me that if you buy a new modem that advertises better, and when it works, it's faster, but actually doesn't work very much. Well, okay, I bought a really fast car, but most of the time it's in the garage. Oh, well, thanks a lot. Well, I'm not sure. I would say that the record here is, at best, Professor Newman's opinion, and the court fully considered it. This was not a situation where the court weighed evidence. We did say to the court, consider this evidence. It does not rise to a genuine material fact. And so to your point, Judge Fletcher, the testimony was that it might be, under those limited test circumstances, a noticeable, noticeable, undefined latency. Latency is merely delay between the person's home computer or their local area network talking to the cable operator, in this case. And so to get, to further respond to your point, the appellants testified, or themselves, that they only had intermittent or occasional problems. Now, Professor Newman never inspected their devices, never did any testing. We have a complete absence of the record, and this is a motion that was brought at the very end of the case. The ruling came just on the eve of trial. So we're not talking about a situation that I think Your Honor is describing of, you know, something that never works. The evidence is that the modem always worked. It never stopped working. There just may be moments of delay, or what was called slow or glitch performance. But that is a far cry from the, going right to the Hodson versus Mars opinion, talking about the Collins versus E-Machines and the Rutledge versus Hewlett-Packard cases discussed in there, where in both of those situations, the Hewlett-Packard computer completely failed, the E-Machines corrupted data, and there was a complete failure. What we have here is, at best, a description of some minimal latency problems. And as Judge Rawlinson asked of Mr. Schubert, there is no industry standard on a DOCSIS III modem for latency. So certainly, if this was a significant problem, there would have been an industry standard that would have applied. The whole point of a cable modem is that, in fact, it is standardized. Essentially, it's translating. It's acting as a translator between the person's home internet computer and devices to the cable operator. And so there is no evidence. There's just a complete absence of evidence that the modems did not work and that they failed to work. Counsel, is there evidence in the record that these parties were able to Skype, they were able to access their email, and perform most of the uses of computers that we expect to be able to perform? Yes, Your Honor. Mr. Alexander had no problems with email or web browsing. And Mr. Knowles said that he had occasional problems with Skype conferencing. But the court needs a specific site. I'll see if I can find that. Well, I don't need a specific site. I was just wanting to confirm that my report it with what you understand the record to be. Yes, Your Honor. There was never a situation like eMachines or in Rutledge where the laptop screen would not function and had to be connected to another device to work. There was no evidence here that there was any problem like what was I said, eCollins. The Collins versus eMachines case where the hard drive is actually corrupted. So we have a situation here where plaintiffs are trying to create a tribal issue of fact, but there really is not one here with regards to either the Song Valley Warranty Act claim, which goes to a very minimal level of fitness for its ordinary purpose. And the record fully supports that the modem at all times met that standard. And then with regard to the claims, as we've talked about it, the four to five stars is puffery. The issue with regard to up to 1.4 gigabits per second, I think, and I want to go back to what Mr. Schubert was talking about, about the disclaimer, because I think that's important to see. And I think we agree with them that the court should look at the advertising claims that are at issue completely in full context. And so what you have here is true representations about the number of upstream and downstream channels, 32 downstream channels. This is at ER 3074. It's the And it has 32 download and 8 upload channels. Those are absolutely true. And then on the back of the box, it has the representations, again, up to 1.4 gigabits. On the side of the box, and that is at ER 3077, it says check with your local cable provider for broadband cable service is required to use this product. ERIS cannot guarantee the availability, reliability, or performance of the broadband service used. And it also says actual speeds will vary. So even conceding Newman's, Professor Newman's report that there may be some noticeable latencies, it's fully disclaimed in connection with the actual speeds will vary and are often less than the maximum possible. So under VIT versus Apple Computer, which we cited in our papers, and under Maloney versus Verizon Internet Service, which we also cited on page 40 of our brief, the up to 1.4 gigs was true, or it was not misrepresenting what the capacity was of the product. Since I only have a few moments, I do want to, you know, I do want to make sure there is no industry standard for latency. That's at SER 4295. That's Mr. Newman, plaintiff's expert, agreeing with that. I want to talk briefly about the compatibility issue. Council didn't really raise that in argument, but obviously I won't have a chance to rebut. There is a claim that the product was not compatible. But based on Professor Newman, he said that the product was capable of delivering and could achieve the 32 by 8 channel bonding that was advertised. That's at SER 4328. He agreed at SER 4428 that it was Comcast that was artificially limiting the SB6190 to 24 channels maximum. So both Professor Newman and our expert agreed that tomorrow Comcast could provision all 32 channels, and there's no dispute that the SB6190 could achieve those speeds if Comcast essentially released the governor on the additional channels in this case. We think that in light of that, with the plain disclaimers on the box that I just talked about, to check with your local cable provider for high-speed data service, you know, make sure your broadband cable access is available, and that EROS can't guarantee those speeds, that there were no false representations whatsoever. If the court has no further questions, I will simply ask the court to affirm the judgment in favor of EROS. You're muted. There we are. Mr. Schubert, you've saved some time. We've got about three minutes. Yes. I'd like to first address Judge Rawlinson's questions regarding the name plan, the evidence, and the record. So this is at ER3033. Mr. Knowles testified that the issues that he had with the modem were, quote, severe and made gaming impossible. He also testified that they, quote, regularly and significantly affected my Skype conversations and calls, resulting in impaired call clarity and degradation, delays, dropouts, desynched audio and video, and lost connections. And then Mr. Alexander, he testified at his deposition. He was asked, and this is at ER3637, what is your complaint about what is wrong with the SB6190? Answer, that it performs very poorly as opposed to what it should be. My prior modem performs better than this one does, and so does my current one. So I think, you know, there's very clear evidence that these were significant problems, and that when EROS marketed them as an upgrade, they clearly were not better. In fact, they were worse. I know my friend on the other side mentioned the testimony of Jennifer Hayes. She actually testified at her deposition that, quote, we delineate our portfolio in a good, better, best pattern, and the stars reflect, you know, the SB6141, that's a good product. The SB6183, that's a better product than the 6141. SB6190 is the best. So I think these representations were really designed to induce consumer reliance, and of course, the California Court of Appeal and Demetri's found much more general statements were actionable because Yelp made those specific and detailed statements to, quote, induce consumer reliance. I think Ms. Hayes' testimony makes very clear that these statements were also designed to induce consumer reliance. Counsel, in this time of Zoom, I think all of us have experienced that computer systems do not work all of the time smoothly, but that's a far cry from saying that they're not fit for their intended use. I mean, if every computer worked glitch-free, that would be highly unusual. So how do we discern, without a minimum standard, how do we discern the difference between a computer that has normal glitches and a computer that's not merchantable, that's not fit for its intended use? Because if they were able to use the modem, it's just it didn't function as well as they'd like. That's probably true for everyone who has a modem. Yeah, and to answer that question, I think, I take your question as addressing the implied warranty of merchantability, which sets the standard of whether a product is fit for its ordinary use. You know, we think there is a lot of significant evidence that it wasn't fit for its ordinary use, but I would also point out that that is not the standard under California's consumer protection laws, the UCL and FAL, which only say that you need advertising that has the tendency to mislead, not whether the product is defective. And I think very clearly under Hodgson, we can show that these defects affected the central function. And I think that goes back to the representations, though. That goes back to the representations. And also, there's a question about the expert and his failure to articulate what standard are we measuring this against? Those are questions in my mind regarding how a material issue of fact is raised if we don't even have a standard against which we're measuring. Right. And I think the expert measured against ARIS's own standards. And I think there's a lot of evidence in the record that showed that ARIS itself viewed these things as a significant problem. And there are quotes from Gene Russo in the record that says it was a big problem that affected the industry. Well, having a problem and meeting a standard are two different things. There's nothing in the records that says this should be functioning at a minimum speed and it functions at this speed. That's usually how we are able to assess whether or not a minimum standard has been met. Saying something is a problem is very vague in terms of whether or not a standard has been met. I take your point. There are points in the record where Dr. Newman did quantify the problem. He testified, this is at SCR 4334, that the latency defects, including high jitter, would cause throughput decrease by 25% or more, resulting in significantly slower file downloads. That's very technical talk and very high-level description. Well, there is technical talk, no doubt, in his reports, but he also put it in terms for ordinary consumers. He said at SCR 4291 that the latency problems were the online equivalent of a vehicle, quote, getting stuck in your driveway for hours on end. So these were very frustrating, annoying problems for users. Both of the named plaintiffs experienced these frustrating problems. I think Eris's own test showed these quantifiable differences that our expert, in his expertise, said would cause very significant problems in terms of slow downloads and hiccups playing online games, dropouts in video and Skype conversations, that we're pernicious and we're a problem. So I think given these defects and the fact that Eris itself classified them as defects, I think we do meet the test for consumer advertising under the UCL and FAL, both based on the representations and also as a pure omissions question. One final thought. Why is it that the expert never examined any of the modems or used any of the modems? You know, I think the expert relied on Eris's and Intel's testing. I the problem was an issue with the Puma 6 chip. That chip was in every SB6190 modem. So I don't think there was really anything additional to glean from examining the plaintiff's modems. They had the exact same modem that everyone else had, and he found that there were problems with the chip that was in every modem. But did he examine any of the modems in terms of email or gaming or Skype or any of the practical applications? He did. He did examine the testimony of the plaintiffs, both at their depositions and in their sworn statements, and he found that those problems that they experienced were consistent with and very likely caused by the SB6190's defects. I guess what I'm asking is, did he actually hook the modem up to try it and opine on what the problems actually were? He did not do any of his own testing of the modem. He relied on the Eris and Intel. All right. Thank you. Thank you. I see I'm over time, so I thank the court for its indulgence, and we ask that you reverse. Okay. Thank both sides for your helpful arguments, both Mr. Schubert and Ms. Stagg. Knowles v. Eris International is now submitted. We've got one remaining case on the argument this morning, and that is going to be Peres-Cruz v. Garland.
judges: W. Fletcher, Rawlinson, Bade